GARBARINI FITZGERALD P.C.
Richard M. Garbarini (RG 5496)
rgarbarini@garbarinilaw.com
420 Lexington Ave.
Suite 2743
New York, New York 10170
Telephone: (212) 300-5358
Facsimile: (888) 265-7054

*Attorneys for Plaintiff*


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SPA-SIMRAD, INC.,

|  |  |
|---|---|
| Plaintiff, | Case No.: 14-cv-5165 |
|  |  |
| v. | ECF CASE |
|  |  |
| DANIEL WAINSTEIN, MARISSA WELNER, JONATHAN LEINWAND,  MICHAEL SOKOLOFF and THOMAS SEIFERT, | **FIRST AMENDED COMPLAINT AND JURY DEMAND** |
|  |  |
| Defendants, |  |
| - and - |  |
|  |  |
| MASTIFF GROUP, LLC, |  |
|  |  |
| Nominal Defendant. |  |

-------------------------------------------------------------x


Plaintiff, SPA-Simrad, Inc., by and through its attorneys at GARBARINI FITZGERALD

P.C., brings this Complaint and Jury Demand for: (i) violations of the Racketeer Influenced

Corrupt Organizations Act at 18 U.S.C. §§ 1962(a), (b), (c) and (d), as authorized by 18 U.S.C. §

1964(c); (ii) violations of the Antifraud Provisions of the Federal Securities Law codified at

Section 17(a) of the Securities Act (15 U.S. Code § 77q(a))and Section 10(b) and Rule 10b-5

thereunder of the Exchange Act; (ii) deceptive and unfair business practices and false advertising

in violation of New York General Business Law ("GBL") §§ 349 and 350; and, (iv) common-

law fraud, against Defendants Daniel Wainstein, Marissa Welner, Jonathan Leinwand, Michael

Sokoloff and Thomas Seifert as well as fictitious fraudulent shell corporation and Nominal

Defendant Mastiff Group, LLC (collectively the "RICO Defendants"). Plaintiff alleges upon

personal knowledge as to itself and upon information and belief as to other matters, as follows:

## NATURE OF THE ACTION

1.      The criminal enterprise at the center of this matter (referred to here as the

"MASTIFF Enterprise"), employed or was associated with RICO Defendants -- WAINSTEIN,

WELNER, LEINWAND, SOKOLOFF and SEIFERT as well as fictitious shell corporation and

Nominal Defendant MASTIFF GROUP, LLC.

2.      The RICO Defendants are a group of professional criminals, notorious in the

world of "pump-and-dump" securities fraud.[1] The RICO Defendants have spent the last ten (10)

years operating with complete impunity, outside of the law, defrauding companies and tens of

thousands of investors for their own benefit. Their *modus operandi* is to first identify companies

that are in dire need of capital, and then, through fake offers to provide capital, impair the

company in need. Alternatively, the RICO Defendants create phony companies, which is more

difficult. The RICO Defendants then register the worthless companies on the Over-The-Counter

(OTC) market,[2] and artificially inflate the price of their worthless stock through fraudulent

promotions, bogus press releases, and fraudulent SEC filings, among other methods. Once the

---

[1] "Pump-and-dump" schemes involve the touting of a company's stock (typically small, so-called "microcap" companies) through false and misleading statements to the marketplace. Usually company insiders and paid promoters are behind the fraud, and stand to gain by selling their shares after the stock price is "pumped" up by the buying frenzy they create. Once these fraudsters "dump" their shares and stop hyping the stock, the price typically falls, and investors lose their money. See http://www.sec.gov/answers/pumpdump.htm
[2] The OTC market is an "off-exchange" market where "penny stocks" are traded directly between two parties without any supervision by an exchange.

worthless stock price is sufficiently inflated through these fraudulent means, the RICO Defendants then dump their over-valued shares, leaving the investors with nothing.

3.      Over the past ten (10) years (the "Relevant Period"), the RICO Defendants have committed dozens, realistically hundreds, of RICO predicate acts in order to accomplish their numerous frauds.  The subject RICO predicate acts include; mail and wire fraud (18 U.S.C. §§ 1341, 1343) and violations of the Martin Act, among others.

4.      The fraud perpetrated by this cabal of professional criminals here was an attempt to destroy SPA-SIMRAD, and then take over the impaired company, while putting up nothing of value, in order to run their typical pump-and-dump fraud.  In or about June of 2011, RICO Defendants WAINSTEIN and WELNER were introduced to Anthony Giorgio, CEO of SPA-SIMRAD, by Michael Tew who claimed he was friends with the duo, and represented WAINSTEIN and WELNER were capable of providing funding or assisting with a proposed merger. (Tew later admitted he lied, and had never met WAINSTEIN or WELNER prior to the introduction.)  From 2011-2012, WAINSTEIN and WELNER negotiated a funding/merger deal with SPA-SIMRAD, which was ultimately rejected by Mr. Giorgio.  A fiscal crisis in 2013, however, necessitated SPA-SIMRAD resurrect the possible funding/merger deal.

5.      In December of 2013, Anthony Giorgio called RICO Defendants WAINSTEIN and WELNER in New York, and informed them SPA-SIMRAD needed funding immediately, but in no case later than May 15, 2014.  Funding was critical at that time to fund orders for specialized night-vision scopes needed for our fighting men and woman and Israeli troops. Additionally, Giorgio informed WAINSTEIN and WELNER that without the funding, SPA-SIMRAD would irreparably damage its relationship with its main vendor, a vendor that representing 85% of Plaintiff's business.  After numerous discussions over the following weeks,

WAINSTEIN and WELNER offered Plaintiff a deal that would have purportedly provided a large capital investment through a "reverse merger" -- with a significant payment ($300,000) to SPA-SIMRAD at the closing of the "reverse merger" scheduled for May 15.  RICO Defendants WAINSTEIN and WELNER also agreed to a "Bride Loan" in case the deal was not finalized by the May 15 deadline.  In return, SPA-SIMRAD would give 49% of the company to the "acquiring company", and would go forward as an independent subsidiary of the "acquiring company" listed on the OTC Market.  WAINSTEIN and WELNER also demanded Plaintiff forgo exploring other avenues of funding (which were available at that time).  Mr. Giorgio agreed, and the trap was set.

6.      WAINSTAIN and WELNER then sent dozens of fraudulent emails, and participated in just as many telephone conferences, guaranteeing the MASTIFF Enterprise had the agreement of the "acquiring company", and readily available capital to make the initial capital investment in SPA-SIMRAD and Bridge Loan if needed.

7.      The RICO Defendants then intentionally delayed the deal, but promised on numerous occasions over the next two months to fund the Bridge Loan.  During this period, SPA-SIMRAD demanded due diligence on the company that was about to acquire it.  On this issue, the RICO Defendants promised to provide the requested diligence, but never produced a single page or even the name of the acquiring company.  SPA-SIMRAD relied on the repeated fraudulent representations of the RICO Defendants, until it became too late to identify other avenues of funding.

8.      On May 20, 2014, the RICO Defendants finally identified the "acquiring company", but produced no due diligence.  SPA-SIMRAD was too desperate at this point to keep repeating its demands, and was forced to move forward and rely on the repeated false

representations of the RICO Defendants.  The Bridge Loan, of course, was never funded, SPA-SIMRAD lost its primary vendor and the specialized night-vision scopes never arrived to our troops or our allies in Israel.

9.      The RICO Defendants plan worked perfectly, SPA-SIMRAD was irrevocably injured, and now at the mercy of the RICO Defendants.   We now know neither the RICO Defendants, nor the "acquiring company", had the ability, or intention, of ever providing any capital.  No due diligence was ever produced on the acquiring company for good reason – it was a company in name only.  It had no assets, no revenue, no office, no website, no telephone and no employees.   This entire charade was a fiction with the primary objective to inflict severe and sustained economic hardship upon SPA-SIMRAD.  The RICO Defendants may have succeeded in destroying a good company, but the Defendants didn't quite anticipate SPA-SIMRAD would not go through with a public offering on the OTC Market knowing it was damaged beyond repair.  Unlike the RICO Defendants, Mr. Giorgio has spent the last twenty-five years both in the military, and supporting the military and local law enforcement.

10.      The foregoing resulted in more than $5,000,000 in damages to SPA-SIMRAD to date, and is projected to be well over $15,000,000.  This matter is about a good company that was lured into relying on the false promises of professional charlatans whose only intention was to use any means to wrest control of a company from a descent group of people, no matter what the cost.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1337 (federal question) and 28 U.S.C. § 2201 (declaratory judgment), and the civil remedies authored

under Section 1964(c) of the Title IX of the Organized Crime Control Act of 1970 (the

Racketeer Influenced and Corrupt Organizations Act or RICO Act).

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events

given rise to this lawsuit took place in the Eastern District of New York. The scheme to defraud

SPA-SIMRAD was initiated and orchestrated from this District, making this District the Court

with greatest interest in preventing frauds to the individuals who reside in this District. Venue is

proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(a) as the residence of

the primary RICO actors WAINSTEIN and WELNER. This District has a significant interest in

fraud, which originated, and was orchestrated, from this District across State lines.

13.     This Court has supplemental jurisdiction over the New York state law claims

pursuant to 28 U.S.C. § 1367, as they are so related to the claims over which this Court has

original jurisdiction that they form part of the same case or controversy under Article III of the

United States Constitution.

14.     The federal claims here are not wholly immaterial or insubstantial, entitling

Plaintiff to take advantage of the federal statute's nationwide service of process provision

codified at 18 U.S.C. § 1965(b).

15.     Personal jurisdiction over RICO Defendants DANIEL WAINSTEIN and

MARISSA WELNER is reasonable and proper in this District because each is a citizen of the

State of New York and resides in this District. Through their activities in this District,

WAINSTAIN and WELLNER served as the ringleaders and primary actors in the MASTIFF

Enterprise's scheme to defraud Plaintiff. As for SPA-SIMRAD's claims for violations of 18

U.S.C. § 1961 *et seq.* and New York state law, exercise of jurisdiction over WAINSTAIN and

WELNER is proper pursuant to 18 U. S. C. § 1965(a), and N.Y. C.P.L.R. § 301.

16.      SPA-SIMRAD need only prove personal jurisdiction over one of the Defendants in order to establish this Court is the proper venue under this Circuit's decision in *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998).  Being that WAINSTAIN and WELNER are residents of the District and the individuals that initiated and orchestrated the fraud from this District; both Defendants clearly satisfy the minimum contacts test.  SPA-SIMRAD need not prove personal jurisdiction over any other Defendant to establish venue.

17.      Personal jurisdiction over fictitious corporation and Nominal Defendant MASTIFF GROUP, LLC is reasonable and proper in this District because Nominal Defendant MASTIFF GROUP, LLC is a citizen of this State with an office at 130 Williams Street, Suite 403, New York, New York and because it conducts substantial fraudulent activities in and from this State by and through the activities of WAINSTEIN and WELNER in this District purportedly on behalf of Nominal Defendant MASTIFF GROUP, LLC.  As for SPA-SIMRAD's claims for violations of 18 U.S.C. § 1961 *et seq.* and New York State law, exercise of jurisdiction over Defendant MASTIFF GROUP, LLC is proper pursuant to 18 U.S. C. §§ 1965(a) and (b), and N.Y. C.P.L.R. § 301.  Defendant MASTIFF GROUP, LLC is named herein as a Nominal Defendant.

18.      Personal jurisdiction over JONATHAN LEINWAND, MICHAEL SOKOLOFF and THOMAS SEIFERT is reasonable and proper in this District.  All are residents of the United States and claimed to be a principal or employee of Nominal Defendant MASTIFF in New York.  Each claimed it conducted substantial business through MASTIFF's New York office located at 130 Williams Street, Suite 403, New York, New York.  LEINWAND, SOKOLOFF and SEIFERT each claimed that all funding came from New York, and all deals were to be finalized in New York.  For SPA-SIMRAD's violations of 18 U.S.C. § 1961 *et seq*., the exercise of

personal jurisdiction over each of these Defendants is proper in this District pursuant to 18

U.S.C. § 1965(b).  The ends of justice require application of the nationwide service provisions of

18 U.S.C. 1965(b) because there is no district in which all of the RICO Defendants could be tried

together.  For SPA-SIMRAD's claims under New York law, exercise of jurisdiction over

Defendants LEINWAND, SOKOLOFF and SEIFERT is proper pursuant to N.Y. C.P.L.R. § 302.

Through their agents and co-conspirators, Defendants LEINWAND, SOKOLOFF and SEIFERT.

have transacted and continue to transact business in the State of New York, and there is a

substantial nexus between Defendants LEINWAND, SOKOLOFF and SEIFERT's purposeful

availment of the New York forum and SPA-SIMRAD's claims.

## THE PARTIES

19.     SPA-Simrad, Inc. ("SPA-SIMRAD") is an entity that supplies high tech weapons,

weapon related products and military accessories.  Anthony Giorgio is the owner and operator of

SPA-SIMRAD and has 25 years of specialized experience in the military field.

20.     Defendant Daniel Wainstein ("WAINSTEIN") is an individual and a resident of

Queens, New York.  WAINSTEIN represented he was an agent or employee of Nominal

Defendant MASTIFF and initiated and orchestrated the scheme to defraud SPA-SIMRAD from

this District.

21.     Defendant Marissa Welner ("WELNER") is an individual and a resident of Long

Island, New York.  WELNER represented she was an agent or employee of Nominal Defendant

MASTIFF and, along with WAINSTEIN, initiated and orchestrated the scheme to defraud SPA-

SIMRAD.  WELNER maintains an office located at 130 Williams Street, Suite 403, New York,

New York, which doubles as the office for Nominal Defendant MASTIFF.

22.     Defendants WAINSTAIN and WELNER are the primary actors in the Mastiff Racketeering Enterprise.

23.     Jonathan Leinwand ("LEINWAND") is an individual and an attorney who resides in Miami-Dade County, Florida and is a member of Nominal Defendant MASTIFF. LEINWAND functioned as both lawyer and principal of Nominal Defendant MASTIFF and provided material assistance to ringleaders WAINSTEIN and WELNER in the scheme to defraud SPA-SIMRAD.

24.     Upon information and belief, Defendant Thomas Seifert ("SEIFERT") is an individual, and a resident of Colorado.  SEIFERT is also an agent or employee of Nominal Defendant MASTIFF and assisted WAINSTAIN and WELNER in the scheme to defraud Plaintiff.

25.     Upon information and belief, Defendant Michael Sokoloff ("SOKOLOFF") is an individual, and a resident of Florida.  SOKOLOFF is also an agent or employee of Nominal Defendant MASTIFF and assisted WAINSTAIN and WELNER in the scheme to defraud Plaintiff.

26.     Upon information and belief, Nominal Defendant Mastiff Group LLC ("MASTIFF") is a Delaware limited liability company with is primary place of business located at 130 Williams Street, Suite 403, New York, New York.  Nominal Defendant MASTIFF is a corporation in name only, with no assets, and served only as the artifice for WAINSTAIN and WELNER to defraud Plaintiff, with the aide of the other RICO Defendants.

27.     Nominal Defendant MASTIFF lists only Defendants SOKOLOFF and LEINWAND as principals, but SEIFERT, WELNER and WAINSTEIN have all represented they are agents and/or employees of nominal Defendant MASTIFF.  Nominal Defendant

MASTIFF has been named in numerous false press releases in an effort to run stock prices up at other pump-and-dump targets on behalf of the MASTIFF Enterprise.

      28.     Together this group is referred to collectively here as the "RICO Defendants."

## THE RICO DEFENDANTS

29.     Before explaining the fraudulent scheme and material misrepresentations of the RICO Defendants at bar, a brief history of just some of the prior criminally fraudulent schemes of the RICO Defendants and the Enterprise is necessary.

30.     The MASTIFF Enterprise is an on-going criminal enterprise that existed long before the fraud at bar, and, if they are not stopped here, will continue to defraud companies and investors in the future.

### Defendant and Primary Actor Daniel WAINSTEIN

31.     Defendant WAINSTEIN has been conducting pump-and-dump schemes for many years.  He is the sole voting member and has all dispositive power with respect to shares held of another fraudulent shell entity called the Marjorie Group, LLC.  Defendant WAINSTEIN was an unindicted co-conspirator in *U.S. v. Goldshmidt, et al.*, 13-MAG-0828 (S.D.N.Y. 2013).  In the indictment in that matter, attached to this Complaint as **Exhibit EE**, from February 2012 through at least March 27, 2013, Defendant WAINSTEIN went to great lengths to unlawfully promote and manipulate the market of a bogus and utterly worthless stock for the company Face Up Entertainment Group, Inc.  A company that did not actually exist. See pages 6 and 7 of the indictment, **Exhibit EE**.  WAINSTEIN is identified as CC-1 (co-conspirator 1) in the indictment.

32.     Defendant WAINSTEIN was not indicted in the Face Up Entertainment scam because he was forced to turn on his comrades and provide material support to the Government. See **Exhibit EE**, at pg. 2.  WAINSTAIN did not provide material support because he realized the

error of his ways, but rather because his comrades turned on him.  As the U.S. Attorney for the

Southern District of New York stated:

> As alleged, these defendants preyed on unsuspecting investors by manipulating the share price of a publicly traded stock in a classic 'pump and dump' scheme that they thought would reap big dividends. But when their pot of gold failed to materialize, **they allegedly turned on a co-conspirator with threats and extortion, showing that their greed was strong enough to make them turn to violence**.

33.     The indictment further provides Defendant WAINSTEIN, communicating

through prepaid cellular telephones to avoid detection, openly discussed price manipulation with

his fellow co-conspirators. See **Exhibit EE**, page 12, and *passim*.

34.     Defendant WAINSTEIN has run numerous other pump-and-dump scams

including, but not limited to, worthless companies Optimum Interactive (USA) Ltd. (OPTL),

Internet Defender, Inc. (YIDI); Alternative Energy Group (AEGY); and SK3 Group (SKTO).

**Defendant and Primary Actor Marissa WELNER**

35.     Defendant WELNER has been assisting her boyfriend WAINSTEIN in his

securities scams for years, and has run her own fraudulent securities schemes as well.  She was/is

an officer at pump-and-dump worthless corporations Numobile Inc. (NUBL), Priority One Jets

and Priority Aviation, Inc. (PJET).  Priority Aviation, Inc. has a New York office, which doubles

as WELNER's office and the office for Nominal Defendant MASTIFF as well.

36.     Defendant WELNER is the principal (and only member) of Madison Consulting

Services, LLC which has an office at WELNER's home in Great Neck, Long Island.  Madison

Consulting Services, LLC held debt and stock in pump-and-dump scam company -- Electric Car

Company, Inc. (ELCR).  WELNER received money from ELCR, a company that, at no time, had

actual assets.  The 29,000 investors I ELCR, of course, were left with nothing.

**Defendant and RICO Conspirator Thomas SEIFERT**

37.    Defendant SEIFERT has been the CFO of numerous companies where he participated in securities pump-and-dump schemes concerning the stock of those companies, some of which resulted in criminal pleas against other officers and the market makers of the subject companies.  SEIFERT's pump-and-dump scams include, but are not limited to: GlobalNet Corp. (GLBT) formerly iDial, Evolucia, Inc (ILED), WhereverTV Broadcasting (TVTV), and The Nicholas Investment Company Inc. (GISBeX).

38.    Defendant SEIFERT was going to be the CFO of the new corporate shell at bar. It appears Defendant SEIFERT is the go-to inside lackey for the MASTIFF Enterprise.

**Defendant and RICO Conspirator Jonathan LEINWAND**

39.    Defendant LEINWAND has been a very busy man in the world of securities fraud, and was involved in pump-and-dump schemes involving; 3D Eye Solutions, Inc. (TDEY), Minfpix Corp. (MPIX), EMAX Holding Corp. (EMXC), World Surveillance Group, Inc. (WSGI), Sanswire Corp. (SNSR), Georgetown Corp. (GTCP), Artyfest Int. Inc. (ARTS), and ProTek Capital, Inc. (PRPM), to name just a few.

40.    Defendant LEINWAND was instrumental in helping Przemyslaw Kostro and John Caterham orchestrate a pump-and-dump scheme that turned a $3.6 million investment into well over $21 million on the backs of World Surveillance Group Inc. (WSGI) investors. Defendant LEINWAND never registered his nine million shares of WSGI, which he dumped for a very tidy profit.

41.    Defendant LEINWAND is a sought after attorney by criminals seeking an individual willing to write Attorney Letters and Opinion Letters verifying the worth of worthless

companies like: Smart Holdings Inc. (SMHS)(SEC Freeze); ProTek Capital, Inc. (PRPM)(SEC freeze, arrests and litigation); 3d Eye Solutions, Inc. (TDEY)(SEC litigation); and, Sanswire Corp. (SNSR)(litigation).  LEINWAND supported each of the forgoing companies, knowing they were worthless at the time he wrote his attorney and/or opinion letters.

42.     LEINWAND's own company GlobeTel Communications (GTEM), was shut down by the SEC as a scam after it was delisted.  Defendant LEINWAND was not just the corporate counsel for GTEM, he moved over to become CEO.  The company issued dozens of false press releases under Defendant LEINWAND, pumping up the stock until the dump.

43.     Defendant LEINWAND was also counsel, officer and major share-holder of PGS Pharmaceuticals Group, which appears as a cautionary tale about foreign boiler rooms in an Australian government pamphlet called the "*Little Black Book of Scams*."

44.     Defendant LEINWAND ruthlessly acts as general counsel, outside counsel, officer, director and majority shareholder in numerous companies in which he pumps the stock price up to the detriment of the general public.  It only makes sense that Defendants WAINSTAIN and WELNER would seek the aide of this nefarious individual to join the MASTIFF Enterprise.

45.     Defendant LEINWAND likely learned the stock fraud trade from his father-in-law, Leonard Rosenberg, with whom he worked on several fraudulent pump-and-dump scams. Rosenberg had numerous actions taken against him by the SEC for fraud, see, e.g., SEC Digest located at http://www.sec.gov/news/digest/1999/dig042199.pdf, until he was eventually arrested and went to jail for fraud in Canada.  The February 25, 2006 *Global Advisor* had this to say

about Defendant LEINWAND's father-in-law and partner:

> After more than a decade of investigations, inquiries and preliminary hearings, Rosenberg pleaded guilty in April, 1993, to 13 counts of fraud. Crown prosecutors said the fraud cost investors more than $131 million.
>
> Rosenberg spent barely a year of his five-year sentence in jail. He was granted full parole on Oct. 31, 1994. Parole board records show he faced a contraband charge while inside that was later dismissed. Some prison officials opposed his parole, arguing in documents that they had seen an increase in fraudulent behaviour by Rosenberg and a lack of respect for rules "similar to that toward defrauded institutions." In fact, his case-management team "strongly opposed" his release on day parole. But the parole board decided that he showed remorse.
>
> After his release, Rosenberg returned to Miami, where he and his wife, Renée, had a mansion. **He dabbled in a few businesses and became a consultant to a company run by his daughter Alison, Value Holdings Ltd.** It held investments in a number of companies, including a few lumber businesses in Canada, but ran out of money in 2001.

See http://www.globeadvisor.com/servlet/ArticleNews/story/gam/20061124/RO12COLLECTED

46.      On June 15, 1996, a consulting agreement was signed wherein Rosenberg's Value

Holdings (VALH) paid Gemini Integrated Financial (LEINWAND) for no-show consulting

services. See http://www.secinfo.com/dxHAg.76.d.htm

47.      In 1999, LEINWAND became corporate counsel for Value Holdings, Inc., in

addition to his duties as corporate counsel and officer for Gemini Integrated Financial.

(LEINWAND would also later become an officer of Value Holdings).

48.      On November 27, 2000, Value Holding financials showed: "Additionally, a debt

of $195,662 representing accrued consulting fees owed to Gemini Integrated Financial Services

Corp. was converted into 5,590,343 shares of Common Stock."  Renee Rosenberg (wife of

Leonard Rosenberg) and Defendant LEINWAND were the sole members of Gemini, of course.

49.      On July 31, 2001, VALH filed its last financial report, stating: "a net loss of

$5,520,002 for the prior nine months."  Every penny in the fictitious company went to

LEINWAND and his mother-in-law, and the thousands of investors in VALH were left with nothing.

50.      That wasn't enough for LEINWAND.  On August 30, 2006, LEINWAND got Value Holdings reinstated as a corporation.  On July 9, 2007, LEINWAND changed the name of the company to Galea Life Sciences and completed a 25/1 reverse split.  LEINWAND then merged Galea Life with Innovative Technology Acquisition Corp (ITAQ) by giving two shares of Galea Life for every share of Innovative Technology.

51.      On June 23, 2008, the SEC finally stepped in and suspended trading of VALH. All of the worthless companies above – ITAQ, VALH and GLSN (Galea Life Sciences, Inc.) were pumped up with false press releases, and LEINWAND and his family dumped their shares, destroying all investor value.  The SEC revoked the registration of GLSN on April 1, 2013. See http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=3291231

52.      What can't be forgotten is behind all of these scams are thousands of hard-working honest individuals who were victimized by the RICO Defendants.

## NEXUS OF SCAMS

53.      The MASTIFF Enterprise has worked on numerous criminal stock frauds and there is a substantial nexus with the above fraudulent scams and the MASTIFF Enterprise.

54.      Defendant MASTIFF lists an address at 130 Thomas Street, which is also the office listed for Defendant WELNER as well as the office for WELNER's fictitious company Priority Aviation, Inc. See **Exhibit GG** attached to this Complaint.

55.      Defendant WELNER is an officer and on the Board of Directors of Priority One Jets and Priority Aviation, Inc.  Pump-and-dump scam company NuMobile, Inc., which is worthless of course, was reverse merged into Priority Aviation, Inc., another worthless company.

Defendants LEINWAND, SOKOLOFF and MASTIFF GROUP are three of the largest shareholders of Priority Aviation, Inc. with 2,500,000 shares each.  Defendant WELNER owns 17,255,000 shares in the company.

56.    In the Sanswire scam, LEINWAND, a massive share-holder, brought in his buddy Defendant SEIFERT to be CFO, and even issued a press release claiming:

> Since Thomas became a consultant to Sanswire in 2007, he has been an integral part of our efforts to bring the Company up-to-date in its fiscal filings,' said Jonathan Leinwand, CEO of Sanswire.  'He has been focused on rectifying Sanswire's previous issues and ensuring that we become current in our reporting requirements with the Commission so that we can begin to concentrate our efforts on our next stages of growth and development.  We are thrilled to have Thomas become part of our core management team and we are fortunate to have such an experienced and well-respected professional as part of Sanswire.

Attached as **Exhibit FF** is the Sanswire Press Release.  Sanswire was, of course, worthless, and the press release a tool to pump up the stock before LEINWAND, and the MASTIFF Enterprise dumped it.

57.    In the Pro-Tek Capital, Inc. scam, Defendant LEINWAND was the incorporator, registered agent and officer of this worthless company.  Defendants MASTIFF and SOKOLOFF announced a $5,000,000 investment on Pro-Tek, which, shockingly, never happened; but did get the price temporarily up.  Prior to the announcement, Defendant MASTIFF received tens of millions of shares, and Defendant LEINWAND, as counsel for Pro-Tek, issued numerous press releases that temporarily drove the stock up.  Defendant SOKOLOFF sold the stock right before the collapse.

58.    In another scam, Defendant MASTIFF held 7,640,000 shares of Directview Holdings, Inc. (DIRV), Defendant WELNER and Defendant SOKOLOFF also held 7,640,000 each.  DIRV's CEO, Roger Ralston, was found guilty of participating in a data equipment scam

and was forced to spend five months in prison.  More than 15 million new shares were issued

from August 19, 2013 and November 19, 2013, and prior to that, a lot more stock was issued at

$0.001 per share as a conversion of notes.  This was a classic pump-and-dump scam.  After the

stock reached its high in April of 2014, Defendants sold their shares, and the stock quickly

plummeted from $.043 on April 26 to $.0050 months later.  For the Defendants, they were able

to get $328,520.00 each for their block of shares.  For the investors that bought those shares, they

were worth $38,200 eight weeks later.

59.     In the pump leading up to the dump of bogus company 3D Entertainment

Holding, Co., on December 16, 2013, Defendant MASTIFF received 10,714,286 shares, and then

again on January 6, 2014, Defendant MASTIFF received an additional 10,714,286 shares.  On

February 11, 2014, Defendant MASTIFF received 57,152,847 shares.  On February 3, 2014,

Defendant MASTIFF received 57,152,847 shares.  On March 3, 2015, Defendant MASTIFF

received 50,000,000 shares.  On March 19, 2015, Defendant MASTIFF received an additional

50,000,000 shares.

60.     Jonathan D. Leinwand, P.A. was legal counsel to the worthless company.

Defendant LEINWAND was pumping the stock as an attorney while Defendant MASTIFF was

receiving massive blocks of stock.  The CEO, Eddie Vasker, was arrested for his role in the

pump-and-dump scheme, and sentenced to $55,000 restitution and a four year deferred sentence.

Nothing new for Vasker who was sent to jail for his role in Artyfest Int. Inc. (ARTS), and

ProTek Capital, Inc. (PRPM)(other worthless fraudulent companies Defendant LEINWAND

shilled for.)

61.     The Securities and Exchange Commission filed a complaint against Big Apple

Consulting USA, Inc. ("Big Apple"), a shareholder of 3D Eye Solutions, and three principals of

Big Apple including Marc Jablon, the President and CEO of Big Apple Consulting and the former Chairman of 3D Eye Solutions, Inc.  A Complaint was filed in New York by the SEC on November 18, 2009, 6:09-cv-01963-JA-GJK, alleging violations of the Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended, all in connection with the filing of false press releases and other activities of a former client of Big Apple, starting in November 2005 through March 19, 2007.  The Court rendered a verdict finding Big Apple and the principals guilty.

62.     Defendant LEINWAND, of course, was the attorney for Big Apple Consulting.

63.     In another example of the Mastiff Enterprise at work, WELNER through her shell Madison Consulting Services, held 27,757,000 shares in SK3 Group , Inc. (SKTO).  Defendant WAINSTEIN through his shell Marjorie Group also held 27,757,000 shares in SK3 Group, Inc. (SKTO).  Together WELNER and WAINSTEIN together were by far the largest shareholder before they started dumping their stock.

64.     SK3 Group (SKTO) and its partner Alternative Energy Partners, Inc. (AEGY) are two of the most interesting securities scams which MASTIFF Enterprise actors WAINSTEIN and WELNER participated.  These worthless companies announced a merger and then rebranded themselves as marijuana distributers.  The scammers then issued a press release on May 11, 2013 claiming SKTO had purchased companies "medicalgreens.com" and "medicalgreensdirect.com". SKTO claimed "Medical Green has $12,000,000 in contracts", and in a March 22, 2014 press release, SKTO announced Medical Greens had $30,000,000 in contracts.  The problem was that the domain names were actually purchased on February 25, 2013 and the websites did not go live until March 19, 2013.  Also, no companies actually existed.  The trademark for Medical Greens was applied for on March 12, 2013 by "I EQUITY CORP" with a date of first use of February

25, 2013 (the same day the domain names for the websites was purchased). I EQUITY CORP. is controlled by Henry Jan and Robert Hipple. Hipple filed all of the stock increases for SKTO. Problem is, on March 11, 2010, Hipple was banned for 5 years by the SEC from these very activities.

65.     The SKTO stock jumped from $.0006 on March 11, 2013 to $.0459 on March 22, 2013 – a 7,550% increase. Defendants sold before June 6, 2014, the date the SEC stepped in and suspended trading of this worthless, fictitious shell company. The SEC found:

> It appears to the Securities and Exchange Commission that there is a lack of current and accurate information concerning the securities of SK3 Group, Inc. because of questions concerning the accuracy and adequacy of publicly available information about the company, including, among other things, its business activities, the control of the company, and trading in its securities. SK3 Group, Inc. is a Delaware corporation with a business address in Los Angeles, California and its common stock is quoted on OTC Link under the ticker symbol SKTO.

66.     A line has been drawn, and these criminals must be stopped before they are allowed to defraud thousands of additional hard working individuals. The RICO Defendants act with a complete disregard for the law in this Judicial District, and will certainly continue to act with impunity without the aid of this honorable Court.

## HISTORY OF THE PRESENT SCAM

67.     Anthony Giorgio was originally introduced to Defendants WAINSTEIN and WELNER in 2011 by Michael Tew. Tew was recommended to Giorgio by then potential partner the Tactical Products Group. Based on this introduction, Mr. Giorgio trusted WAINSTEIN and WELNER. Mr. Tew, however, has now admitted he did not know either WAINSTEIN or WELNER, and lied about having a relationship with these individuals.

68.     Defendants WAINSTAIN and WELNER attempted to run a fraudulent investment scam in 2011-12 under the guise of providing a capital investment or merger opportunity to SPA-SIMRAD, but Mr. Giorgio eventually rejected the deal.  In December of 2013, circumstances changed, and Mr. Giorgio was in desperate need of capital for SPA-SIMRAD.  This was the opening Defendants WAINSTAIN and WELNER needed. WAINSTEIN and WELNER participated in a conference call from New York with SPA-SIMRAD's CEO Giorgio and its outside counsel Jason Buratti to discuss funding for SPA-SIMRAD.

69.     In 2011-12, Defendants WAINSTEIN and WELNER did not claim to be part of any organization, but that changed in December of 2013 when WAINSTAIN and WELNER claimed to be agents and/or employees of Nominal Defendant MASTIFF.  A new player appeared in addition to Nominal Defendant MASTIFF, and that was attorney and principal of MASTIFF – Defendant LEINWAND.

70.     At all relevant times, Nominal Defendant MASTIFF maintained a fraudulent website located at <www.mastiffllccom>  (the "Mastiff Website") which was instrumental in carrying out the fraud.

71.     The Mastiff Website is a fraudulent advertisement used to trick companies and investors into believing the material misrepresentations of the Enterprise.

72.     The Mastiff Website describes the company as:

> We're experts who have handled the problems public companies face, with an array of methods for solving those problems. They range from investment to restructuring.  For each of our clients, we can assemble complex tactics into a cohesive strategy.

73.     Defendant MASTIFF and its Principals LEINWAND and SOKOLOFF and agents/employees WELNER, WAINSTEIN and SEIFERT do not solve companies problems, or

offer solutions.  This is a fraud, in fact, the entire website is a fraud.  It is designed to induce

individuals and companies, like SPA-SIMRAD, into believing Defendant MASTIFF is an actual

company.  In fact, it sets a trap for real companies into believing this fictitious shell is in the

business of assisting companies solve funding and finance problems.  That is a complete farce.  It

is also designed to lend credibility to the numerous false press releases sent by a means of wire

communication designed to drive stock prices up for bogus companies so the RICO Defendants

can run their securities scams on behalf of the MASTIFF Enterprise.

74.      The Mastiff Website is replete with other blatantly fraudulent statements.  It

describes Defendant LEINWAND as:

> Jonathan has served as general counsel and advisor on capital markets and
> fund raising.  He's been a Board appointed specialist to turn companies
> around.  Jonathan's expertise in OTC and SEC regulations has made him a
> sought after attorney and advisor for micro-cap companies.  He has raised
> $20 million in the last three years for public companies.

75.      Defendant LEINWAND has not "turned companies around", no less been

appointed by any Board of Directors which resulted in "turning that company around."

LEINWAND is sought after only by other pump-and-dump criminals to participate in their

scams.  Defendant LEINWAND has also not raised $20,000,000 in funding.  He may have raised

that much in promoting and participating in securities scams.

76.      Buratti, on behalf of SPA-SIMRAD, visited the Mastiff Website before the

December phone conference and subsequent January 7, 2014 meeting.  The Mastiff Website was

transmitted by a means of wire communication.

77.      On or about January 7, 2014, Giorgio also viewed the Mastiff Website, and the

myriad of fraudulent had its intended affect – Giorgio believed Defendant MASTIF was a

legitimate company.  After reading: BUISESS REENGINEERING

> Mastiff takes a top down approach to business reengineering that has been proven effective as building blocks for transforming an entire business. Our careful analysis of the current workflows and processes, as well as our unique perspective provides our customers with exactly the solutions that they need for their business.

Giorgio trusted Defendant MASTIFF and believed Defendant LEINWAND was a legitimate expert in "Business Reengineering."

78.     All of this proved to be blatant fabrications, and the result was the ultimate destruction of SPA-SIMRAD.

79.     On January 7, 2014, Giorgio and Plaintiff's attorney Jason Buratti, met at LEINWAND's law office in Fort Lauderdale, which is also the Florida office of MASTIFF. LEINWAND, Giorgio, and Buratti, along with WELNER and WAINSTEIN, discussed a possible investment or in the alternative, seeking an entity to acquire part of SPA-SIMRAD.  The RICO Defendants represented they had funds available to close a deal immediately that would have provided an initial capital investment to Plaintiff of $300,000.  This was a lie.

80.     The RICO Defendants, through WAINSTEIN, WELNER and LEINWAND, told Giorgio and Buratti at the January 7, 2014 meeting "not to look for other opportunities, we are in." See page 2 **Exhibit K**.  The RICO Defendants were informed at the January 7 meeting that SPA-SIMRAD intended to attend the "Shot Show" in Vegas later that January.  The Shot Show was vital to developing other investment vehicles and opportunities for SPA-SIMRAD.  The Shot Show was specifically discussed, and later abandoned by SPA-SIMRAD, at the express direction, and in reliance, on the statements made at the January 7 meeting.  The Shot Show was just one of many major funding opportunity lost by SPA-SIMRAD directly due to the misrepresentations of the RICO Defendants.

81.     On January 10, 2014, the RICO Defendants presented SPA-SIMRAD with a Letter of Intent ("LOI") sent from New York by wire to Giorgio, laying out the preliminary terms and conditions of the deal.  The LOI stated the deal as follows: "[A] proposed 'reverse' acquisition ("Acquisition") by Pubco, a publicly traded vehicle to be determined, of all outstanding capital stock and/or membership interests of SPA-SIMRAD." Attached as **Exhibit B** is a true and accurate copy of the Letter of Intent.

82.     This was followed by a hard copy sent by the US mail.

83.     On or about January 10, 2014, Defendant WELNER, on behalf of the RICO Defendants, promised the draft agreements for the deal would be delivered to SPA-SIMRAD within a week.  SPA-SIMRAD informed the RICO Defendants that it required capital immediately, but in no case later than March 15, 2014.  Jason Buratti, on behalf of SPA-SIMRAD, told the RICO Defendants that if they could not provide capital by that date, SPA-SIMRAD would have to find other sources of funding.  Once again, the RICO Defendants expressly stated that SPA-SIMRAD should not look for alternative forms of funding, they had the capital readily available.

84.     The terms of the LOI stated that the Closing would occur no later than March 15, 2014, or the LOI would expire.  As agreed upon by all parties at the January 7, 2014 meeting, Defendant MASTIFF would provide SPA-SIMRAD with funding in the amount of $300,000 at closing and another $600,000 in two subsequent payments.  In return, "'Pubco' would acquire all of the outstanding stock and/or membership interests of SPA-SIMRAD, Inc.," and SPA-SIMRAD would "become an independent wholly owned subsidiary of Pubco." See **Exhibit B** at ¶ 1 and § 1, respectively.

85.     The RICO Defendants refused to divulge the identity of "Pubco".  Plaintiff repeatedly requested due diligence on "Pubco", after all, SPA-SIMRAD was going to be an independent subsidiary of this company.

86.     On February 4, 2014, Defendant WELNER sent an email from New York informing SPA-SIMRAD that the deal documents promised weeks earlier had not even been drafted.  Jason Buratti called Defendants WAINSTEIN and WELNER in New York and informed the RICO Defendants that unless all documents were produced and finalized by the March 15, 2014 date, SPA-SIMRAD would require a Bridge Loan to pay its vendors and contracts.  All parties agreed in principal that a Bridge Loan would be funded in the event of delays that pushed the closing to after the March 15, 2014 date.

87.     On February 12, 2014, Jason Buratti provided the requested vendor contracts and reiterated that "closing asap in lieu of a bridge loan would be great." See Page 2 of **Exhibit C** attached to this Complaint.

88.     In an email dated Feb. 12, 2014, and sent from Long Island, New York, WELNER on behalf of the RICO Defendants, requested SPA-SIMRAD "provide items addressed in the schedules of the agreements.  This will help us to do the diligence while we progress on the documents."  The February 12, 2014 email is attached as **Exhibit C**; see due diligence section supra.

89.     On February 25, 2014, SPA-SIMRAD sent an invitation to RICO Defendants LEINWAND, WELNER and WAINSTEIN to a "Drop-Box" containing every document satisfying the due diligence requests of the RICO Defendants. Attached as **Exhibit D** is a true and accurate copy of the February 25, 2014 email from Jason Buratti to the RICO Defendants. This fulfilled all due diligence requested by the RICO Defendants, and significantly more.

90.     The RICO Defendants failed, at any time, to send a single document in response to SPA-SIMRAD's due diligence request.

91.     The RICO Defendants then began requesting due diligence which was already in the Drop-Box, and used this as an excuse to avoid drafting the Merger Agreement.  In the week before the March 15 deadline, the RICO Defendants simply disappeared, refusing to respond to numerous e-mails and phone calls.

92.     Being that the RICO Defendants refused to draft the Merger Agreement by the March 15, 2014 deadline, the LOI technically lapsed.  All parties, however, agreed to continue with the deal despite the March 15 deadline passing.  SPA-SIMRAD had no choice; the massive delay by the RICO Defendants deprived SPA-SIMRAD of the ability to locate an alternate funding source, something it could have easily done.

93.     SPA-SIMRAD relied on the misrepresentations of the RICO Defendants and represented to its key vendor it would be able to fund the order, which would have required an immediate payment to put the line into production.  This was, in fact, SPA-SIMRAD's largest vendor with whom it conducts eighty-five percent (85%) of its business.

94.     On or about March 20, 2014, SPA-SIMRAD, unable to fund the production, informed the RICO Defendants it would require the Bridge Loan, due to the RICO Defendants' delays in closing, and in order to fulfill the production orders and contracts, which it had previously entered into with vendors and customers. Attached as **Exhibit F** is a true and accurate copy of the March 20, 2014 email from Jason Buratti to the RICO Defendants.

95.     The RICO Defendants agreed to fund the Bridge Loan, prior to finalizing the Bridge Loan document, just to prevent the imminent demise of SPA-SIMRAD.

96.     On March 21, 2014, SPA-SIMRAD reaffirmed that a Bridge Loan must be integrated into the Merger Agreement in order for SPA-SIMRAD to fulfill its purchase orders with vendors.  The purchase orders in question were made in reliance on the March 15, 2014 closing, and the repeated promise by the RICO Defendants that the Bridge Loan would be funded. Attached as **Exhibit G** is a true and accurate copy of the March 21, 2014 email from Jason Buratti to the RICO Defendants.

97.     Both RICO Defendants and SPA-SIMRAD agreed that the Bridge Loan would be integrated into the Merger Agreement under section 5.5 and 7.4(a) of the AGREEMENT AND PLAN OF MERGER AND REORGANIZATION BY AND AMONG GEORGETOWN CORP, GTCP MERGER SUB, INC. AND SPA-SIMRAD, INC. (the "Merger Agreement"). Attached as **Exhibit H** is a true and accurate copy of the Merger Agreement dated May 1, 2014.

98.     On or about March 26, 2014, Jason Buratti offered two Bridge Loan options to the RICO Defendants which would enable SPA-SIMRAD to fulfill all purchase orders and contracts with its vendors and customers. Attached as **Exhibit I**, at pg.2, is a true and accurate copy of the March 26, 2014 email from Jason Buratti to the RICO Defendants.

99.     Again, the RICO Defendants agreed to a Bridge Loan which would be funded immediately; this obviously did not happen.

100.    Repeated requests were made to fund the Bridge Loan, but the RICO Defendants initially ignored these requests.

101.    On March 31, the RICO Defendants promised to fund the Bridge Loan but again unjustifiably delayed.  This was simply another material representations regarding funding.  The RICO Defendants were informed by Jason Buratti that if the Bridge Loan was not funded, SPA-SIMRAD would miss the deadline with its key vendor.  Each time the RICO Defendants swore

the Bridge Loan would be funded, SPA-SIMRAD went back to its key vendor and promised it would be paid.  Finally, SPA-SIMRAD's key vendor, furious with the repeated missed deadlines, sent a letter stating it would cut off SPA-SIMRAD, which would effectively force SPA-SIMRAD to close its doors.

102.    The fact that SPA-SIMRAD was tricked into foregoing other opportunities that would have resulted in alternative funding solutions was relayed to the RICO Defendants.  SPA-SIMRAD's reliance on the repeated misrepresentations also resulted in other vendor relationships being compromised.

103.    On April 1, 2014, the RICO Defendants sent a very rough draft of a Bridge Loan Promissory Note to Plaintiff. Attached as **Exhibit J** is a true and accurate copy of the April 1, 2014 email from LEINWAND to Paul Silverberg.

104.    On April 23, 2014, Anthony Giorgio contacted Defendant WAINSTEIN in New York to express concern and frustration regarding the RICO Defendants' repeated delays in fulfilling their end of the agreement to fund the SPA-SIMRAD merger.  Defendant WAINSTEIN responded with an "apology" and an assurance that he would "find out what's going on and get back to him." Attached as **Exhibit K** is a true and accurate copy of the April 23, 2014 emails between Anthony Giorgio and WAINSTEIN.

105.    After plotting with the other members of MASTIFF Enterprise, Defendant WAINSTEIN called Giorgio from New York and suggested a conference with Giorgio take place the next day.  At that phone conference, Defendant WAINSTAIN, in Queens, promised the Bridge Loan documents would be executed and the loan funded within 24 hours.

106. On or about April 29, 2014 and again on May 2, 2014, RICO Defendants WAINSTAIN and WELNER again promised to have the Bridge Loan documents signed and provide the funding.

107. From May 1 to May 2, 2014, the RICO Defendants and SPA-SIMRAD agreed upon the form of an acquisition agreement (and security agreement) and SPA-SIMRAD signed both. The soft close required the RICO Defendants to fund the $170,000.00 bridge loan – a promise the RICO Defendants repeatedly made, and failed to do.

108. The hard close was contingent upon licensing of the merger subsidiary; licenses the RICO Defendants agreed would be applied for after the Bridge was funded.

109. From May 3-5, 2014, the RICO Defendants continued to unjustifiably delay without good faith or diligence and made material representations that turn out to be false. The RICO Defendants represented the Bridge Loan and the signed documents would arrive each day in this period. Again, these were nothing but the false promises of true professional confidence men and women.

110. Finally on May 6, 2014, Defendant LEINWAND responded to the delays blaming them on "issues with the entity side" but that he was "working with the CFO/Director of that company as he is the one that needs to sign off on everything". He further blamed the delay on the changing of the structure from a bridge instead of an acquisition. He later assured Anthony Giorgio that the CFO of GTCP would be ready to close on that Friday (May 9, 2014). Attached as **Exhibit L**, pg. 2, is a true and accurate copy of the May 6, 2014 email from LEINWAND to Tony Giorgio.

111. The "entity side" issues purportedly lied with fictitious company Georgetown Corp. As we now know, Georgetown Corp., is an empty, asset-less shell, incapable of funding

any loan.  Georgetown Corp. has never had assets, or revenue.  It has no office, website or employees.  It is a fiction – yet this was the company that was about to acquire 49% of SPA-SIMRAD.

112.     On May 9, 2014, the RICO Defendants finally followed through with one promise and returned the signed Promissory Note to SPA-SIMRAD.  The Bridge Loan, however, would not be funded that day, or any day. Attached as **Exhibit M**, pg.2, is a true and accurate copy of the May 9, 2014 email from LEINWAND to Jason Buratti.

113.     It was not until May 12, 2014, that Defendant LEINWAND finally admitted that there was no money available despite multiple and repeated promises that it funds were available and the loan would be funded.  Defendant LEINWAND explained, "Do you really think that if the money was ready we would hold the wire?" Attached as **Exhibit N** is a true and accurate copy of the May 12, 2014 email chain from LEINWAND to Jason Buratti.

114.     Despite the May 12 representation that there was no money, on or about May 14, 2014, Defendant LEINWAND again promised the Bridge Loan would be funded by 2:00 pm that day; it was not. Attached as **Exhibit N** is a true and accurate copy of the May 14, 2014 email from Jason Buratti to LEINWAND summarizing the May 14 conversation.

115.     Again on May 20, 2014, the RICO Defendants assured SPA-SIMRAD that the Bridge Loan funding would be wired to its account by 2:00 pm that day.  SPA-SIMRAD also requested further information about the shell corporation in order to complete the ATF application and upon receipt of both the information and Bridge Loan it would file the applications.  The Bridge Loan was not funded. Attached as **Exhibit P** is a true and accurate copy of the May 20, 2014 email chain from Jason Buratti to WAINSTEIN.

116.    On May 23, 2014, SPA-SIMRAD once again contacted the RICO Defendants regarding the phone conversations between SPA-SIMRAD and WAINSTEIN and LEINWAND and the RICO Defendants' promise to transfer the funds for the Bridge Loan in order to allow SPA-SIMRAD to make payments to its key vendor. Attached as **Exhibit Q**, at pg. 2, is a true and accurate copy of the May 23, 2014 email chain highlighting the relevant correspondence between Jason Buratti and LEINWAND.

117.    Finally on June 2, 2014, Defendant WAINSTEIN contacted SPA-SIMRAD regarding funding of the Bridge Loan and again promised a return call that afternoon to discuss the funding schedule for the full amount of the loan.  In the follow-up call, WAINSTEIN committed anew to funding the Bridge Loan and would "report on the timing of funding later that evening". Attached as **Exhibit R** is a true and accurate copy of the June 2, 2014 email chain highlighting the relevant correspondence between Jason Buratti and WAINSTEIN.

118.    On June 4, 2014, SPA-SIMRAD explained to the RICO Defendants that based on their most recent assurance to fund the Bridge Loan, SPA-SIMRAD accepted a vendor's offer to distribute the vendor products in Israel under SPA-SIMRAD's exclusive distribution agreement. A deal that would produce millions over the next few years.

119.    SPA-SIMRAD requested that if the RICO Defendants make their intentions to fund the Bridge Loan clear.  The RICO Defendants responded by not returning any communication. See **Exhibit R** June 4, 2014 email from Jason Buratti to LEINWAND and WAINSTEIN.

120.    Left with no other choice, on June 11, 2014 SPA-SIMRAD sent a "Notice of Material Breach, Termination, and Damages and Other Claims" letter to the Defendants for their repeated material and fraudulent misrepresentations. Attached as **Exhibit T** is a true and accurate

copy of the June 11, 2014 Notice of Material Breach, Termination and Damages and Other Claims letter.

121.    SPA-SIMRAD, to its own detriment, relied on the RICO Defendants' repeated and regular promises to fund the Bridge Loan.  The delays caused even more damage to the professional relationships that SPA-SIMRAD had spent years cultivating.

122.    Because of the acts and omissions of the RICO Defendants, SPA-SIMRAD was unable to uphold its obligations under the purchase agreements with its vendors; one in particular was SPA-SIMRAD's largest vendor with whom it conducted about eighty-five percent (85%) of its business.  The RICO Defendants were repeatedly informed of this fact, and they repeatedly promised, and failed, to fund the Bridge Loan.  The business relationship between SPA-SIMRAD and its key vendor was intentionally destroyed by the RICO Defendants and resulted in the loss of over ten million dollars ($10,000,000) in revenue to SPA-SIMRAD.

123.    Georgetown Corp. has no assets, and can't raise money -- even for itself.  It was forced to pay 10% interest on a short-term loan of $15,000.00 on January 20, 2012 from KAREV INVESTMENTS, INC.   Georgetown Corp. was anything but a perfect fit for SPA-SIMRAD, after all, the fictitious company describes itself as follows:

> The company will continue with its original mandate of exploration, but will also seek to provide specialized oilfield services and equipment primarily to independent and major oilfield companies engaged in the exploration, production and development of oil and gas properties throughout the United States.

124.    In a recent press release, Georgetown Corp. announced its goal was to:

> In the near term, the new management wishes to increase the service capabilities both for onshore and offshore platforms.

125.    This is not the first time the RICO Defendants have used phony offers of loans to manipulate stocks and destroy companies.

126.     After receiving hundreds of millions of shares in ProTek Capital (PRPM),

Defendant MASTIFF and PRPM announced on May 7, 2014:

>The commitment by Mastiff LLC is to provide up to $ 5,000,000.00 for
>next several years. The company and its management have discretionary
>right to invest, assist and/or acquire companies and projects in the
>marijuana market space. This will include related fields and supplier chain
>for the products and services.
>
>This is the first of many funding commitments and relationships that our
>company, Luxuriant Holdings Inc., will sign and develop for the benefit of
>investing and providing capital for the marijuana and related industry. Our
>plan is beginning to take shape as we develop and focus on strategic
>support that will lead in our ability to grow and expand our investment
>portfolio. This industry is so new, that new grounds and developments are
>being opened and explored. The sky is the limit here. Our management is
>more and more encouraged by the growing interest and developments that
>seem to surround and support the MMJ industry and this market space.
>One is quickly reminded by the growth and explosive developments of all
>kinds of opportunities that new unexplored business territories provide and
>encourage. This reminds me of the early stages in Internet, Software and
>New Media platform explosion, and parallel to the Industrial revolution
>and a hint of the "Gold Rush" from the past. This is why I'm extremely
>excited to build a company that is early to market with its business plan
>and concept.

127.     PRPM did get a jump in stock price, followed by a quick dump of stock by the

insiders, leaving the stock worthless.

128.     The RICO Defendants form a criminal enterprise and will go to any length in their

on-going series of fraudulent schemes.  At bar it meant destroying a good company and the lives

of good people.

129.     Not only did the acts and omissions of the RICO Defendants cause SPA-

SIMRAD to miss multiple deadlines with its key vendor and other business partners, it deprived

SPA-SIMRAD of the opportunity to obtain alternative funding.

## THE DEEPER IMPACT TO SPA-SIMRAD

130.     Anthony Giorgio started SPA-SIMRAD in 1994 with a very small loan from his father who made a modest living as a barber for 45 years. Mr. Giorgio decided that the best way to earn a living for his family, and honor his military background, was to support law enforcement and the federal government with product and services that were not being offered. Mr. Giorgio also made a commitment that SPA-SIMRAD would, "take care of the guys in the field first".  With his knowledge of sniper rifles, scopes and optics, Mr. Giorgio grew SPA-SIMRAD into a vibrant business.

131.     Mr. Giorgio was honored by the National Tactical Officers Association after Mr. Giorgio donated $300,000 in products to police agencies who could not afford night vision for their officers.  Mr. Giorgio started the SPA/NTOA Police grant as an example for others to follow.  Today that grant has given millions in police grants.  SPA-SIMRAD's products have protected the U.S. President, Vice President, and members of the U.S. Congress and Senate since 1998, and played a key role in all  Military actions including the battle for Fallujah were Mr. Giorgio set aside all other production orders to provide the U.S.M.C. with the night vision sights they desperately needed (and no other company could provide given the desired timelines.)  Mr. Giorgio has received many awards for recognition for his service to this country and his spirit of giving back to those are in need who protect us every day.

132.     SPA-SIMRAD employed ten (10) people who had worked there on the average of 12 years. All employees had to be let go as a direct result of the Defendants' fraudulent acts. Most of the employees had families to support.  One 10 year employee had 3 young children, and a second employee of 12 years had a new born.  A third employee of 12 years, who was just recently diagnosed with cancer, was forced to leave without medical insurance coverage, or a

means of support.  These are real people, and a real company, destroyed by the RICO

Defendants' greed.  Perhaps worse than the sacrifice SPA-SIMRAD and its employees have been

forced to make, is the danger the RICO Defendants have visited on local law enforcement and

our military men and women who are fighting for us right now.

## RICO DEFENDANTS FALSLY CLAIM THAT SPA-SIMRAD WAS TO BLAME

133.    After being informed that SPA-SIMRAD was filing the present action in this

Court on a date specific, the RICO Defendants attempted to improperly forum shop by filing a

jurisdictionally defective declaratory judgment in the Circuit Court for the 17th Judicial Circuit in

and for Broward County, Florida (the "Florida Action") titled *Georgetown Corp. et al. v. SPA-*

*Simrad, Inc*, 14-13850, falsely claiming that the Bridge Loan was not funded due to SPA-

SIMRAD's failure to produce requested due diligence.

134.    The Florida Action is nothing more than another fraudulent attempt to manipulate

SPA-SIMRAD and the legal system by making this matter into a breach of contract case; it is

not.

135.    The documents, contracts and agreements involved were merely part of the

fraudulent conveyance by which the RICO Defendants, on behalf of the MASTIFF Enterprise,

attempt to defraud the Plaintiff.  The documents, contracts and agreements at issue were induced

by fraud, and each representation in the documents was fraudulent.  Even the forum selection

clause was fraudulent in that material misrepresentations were made with respect to this clause.

136.    Neither Georgetown Corp. nor GTCO Merger Sub. actually exist in any

meaningful way.  While articles of incorporation were filed for each entity, there is nothing else.

SPA-SIMRAD was induced to sign the subject documents on the express representation they

were actual companies, with assets sufficient to make the capital investment.

137.    The RICO Defendants had no genuine interest whatsoever in due diligence, or funding the $900,000 indicated in the Merger Agreement.  The RICO Defendants deliberately delayed drafting and signing the Merger Agreement to avoid the $300,000 payment due upon execution.  The RICO Defendants sole objective was to damage SPA-SIMRAD and deprive it of every opportunity to obtain funding from legitimate sources.

138.    Once again, this was a classic pump-and-dump, and the fundamentals meant nothing as long as they could start issuing stock and pumping up the price.  Regardless, all due diligence requested from SPA-SIMRAD was produced, and significantly more.

139.    The first reference to "due diligence" was a request in early February of 2014 for SPA-SIMRAD's contract with its main vendor, which, again, was 85% of SPA-SIMRAD's business.

140.    On February 3, 2014, Defendant WELNER also requested SPA-SIMRAD update the financials previously disclosed in the failed 2011 deal. See Page 2 of **Exhibit E**. Jason Buratti responded to WELNER that updating the 2011 financials was exactly what SPA-SIMRAD expected to do. *Id*.

141.    On February 4, 2014, WELNER stated the RICO Defendants also required projections prior to drafting the acquisition agreement and convertible debenture. See Page 1, **Exhibit E**. Shocked, Buratti replied that SPA-SIMRAD was told by the RICO Defendants to expect all draft documents by mid-January. *Id*.  Now, not only were the draft documents not sent by mid-January, the RICO Defendants admitted they hadn't even started to draft them. Buratti responded February 4, 2014, that he would send the requested numbers later that day. *Id*.

142.     On February 4, 2014, Jason Buratti again reiterated to Defendants WELNER, WAINSTEIN and LEINWAND, that any delay would put SPA-SIMRAD in jeopardy. Page 1 of **Exhibit E**.

143.     Shortly after receipt of the February 4, 2014 emails above, Jason Buratti called WAINSTEIN and WELNER to request a clarification on the reason for the delay, and informed the RICO Defendants that unless all documents were produced and finalized by the March 15, 2014 date, SPA-SIMRAD would require a Bridge Loan because SPA-SIMRAD had already informed its primary vendor that it would be paid upon closing of the deal between the parties.

144.     On February 12, 2014, Jason Buratti forwarded the contracts for the main vendors, and reiterates "closing asap in lieu of a bridge loan would be great." See Page 2 of **Exhibit C** attached.

145.     On Feb. 12, 2014, WELNER, on behalf of the RICO Defendants, acknowledged that all contracts requested were received and she forwarded a draft acquisition agreement. WELNER then requested SPA-SIMRAD produce "all items addressed in the schedules for the agreements." See **Exhibit C**.

146.     The forgoing are the only requests for due diligence ever made by the RICO Defendants.

147.     On February 25, 2014, SPA-SIMRAD sent WELNER, WAINSTEIN, LEINWAND all "items addressed in the schedules for the agreements" and all updated documents to the prior to 2011 production. See a copy of the Dropbox sent attached as **Exhibit X**.

148.     On February 28, 2014, SPA-SIMRAD sent their version of the Merger Plan and Subscription Agreement as well as the SPA-SIMRAD financial projections for 2014-2016 as

requested by the RICO Defendants. Attached as **Exhibit Z** is a true and accurate copy of the

February 28, 2014 email from Jason Buratti to WELNER. As of February 28, 2014, every single

document and piece of information requested by the RICO Defendants was produced.

149.    On March 3, 2014, Jason Buratti asked if there was any more documentation

needed from SPA-SIMRAD to fulfill its diligence. Attached as **Exhibit AA** is a true and accurate

copy of the March 3, 2014 email from Jason Buratti to the RICO Defendants. That same day

WELNER responded that she was "trying to get through everything with a fine tooth comb

today.  I will get back to you if we are missing anything." *Id*.  WELNER never found anything

missing.

150.    On March 6, 2014, SPA-SIMRAD once again asked when the RICO Defendants

would provide the diligence on the acquiring corporation and explained SPA-SIMRAD would

assume no diligence for the merger sub.  Defendant WELNER assured SPA-SIMRAD the RICO

Defendants would deliver those documents the following week. Attached as **Exhibit AA** is a true

and accurate copy of the March 6, 2014 email from Jason Buratti to WELNER and

LEINWAND.

151.    Throughout this period, SPA-SIMRAD repeatedly requested due diligence on the

entity that would be acquiring 49% of the company.  Defendants not only refused to provide any

due diligence, they refused to divulge even the name of the mysterious company.

152.    It was vitally important to SPA-SIMRAD to learn the name and officers in the

acquiring company because the numerous licenses held by SPA-SIMRAD to deal weapons and

weapon related technology require the names of all officers and directors.

153.    On May 20, 2014, Defendants, for the first time, represented a company called

Georgetown Corp. would acquire the 49% of SPA-SIMRAD through a shell corporation called

GTCP Merger Sub.  Defendants also named Defendant SEIFERT as the CFO and only officer

and director of GTCP Merger Sub., Inc.  The RICO Defendants represented SEIFERT would not

own any stock in GTCP Merger Sub, Inc., but he did own stock and was the CFO of Georgetown

Corp.  The majority ownership of the new entity would transfer from Georgetown Corp. to SPA-

SIMRAD upon closing of the acquisition. See **Exhibit CC**.  Not a single piece of paper,

however, was ever produced by the RICO Defendants regarding Georgetown Corp. or the GTCP

Merger Sub.

154.    There is a good reason for the RICO Defendants' steadfast refusal to provide any

due diligence – Georgetown Corp. and the GTCP Merger Sub. did not exist.  Georgetown Corp.

was a phantom, foreign shell corporation and the sole owner of GTCP Merger Sub, Inc.

155.    Both Georgetown Corp. and GTCP Merger Sub, Inc. were corporations in name

only, and used solely to carry out the various fraudulent schemes of Defendants WAINSTEIN

and WELNER with the assistance of the other RICO Defendants LEINWAND, SEIFERT and

SOKOLOFF.

156.    At one time Georgetown Corp. was also "penny stock" and traded under the ticker

"GTCP" on the Over The Counter Market.  In actuality, the use of the term "penny stock"

overstates the worth of Georgetown Corp. by one penny; it was a colossal scam.  Georgetown

Corp. (formerly Yukonic Minerals Corp.) described itself as an

> Exploration Stage Company with a principal business plan to acquire,
> explore and develop mineral properties and ultimately seek earnings by
> exploiting mineral claims.

157.    Georgetown Corp. was Yukonic Minerals Corp. until January 24, 2012.  On

January 10, 2012, the Board of Directors of Yukonic Minerals authorized a 1:400 forward split

of its worthless issued and outstanding common shares. As a result, the issued and outstanding

shares increased from 1.35 million worthless shares to 540 million worthless shares.  This is a basic first step in a pump-and-dump fraud.

158.    Georgetown Corp.'s former President and CEO, Mackie Barch is the current President and CEO of Sunpeaks Ventures (SNPK), a recent pump-and-dump scam involving a company run into non-existence.

159.    The original address for Georgetown Corp./Yukonic/GTCP was a Mail Boxes Etc. located at142-108 Elliot Street, Whitehorse, Yukon Territory Y1A 6C.

160.    The Market Maker for GTCP stock was Spartan Securities Group, LTD (SSG) (CRD #104478, Clearwater, Florida).  SSG admitted tom its fraudulent stock promotion scams involving various companies including GTCP.  SSG was forced to submit a "Letter of Acceptance, Waiver and Consent" in which SSG was censured, fined $52,500 and required to revise its Written Supervisory Procedures regarding its: supervisory system, procedures and qualifications; order handling; best execution; anti-intimidation/coordination; trade reporting; short sale transactions; other trading rules; OATS; books and records; the Sub-Penny Rule; and review for compliance of incoming, outgoing and internal electronic communications.

161.    Georgetown Corp. never generated any revenue, nor did it ever have any assets.

162.    Georgetown Corp.'s "Executive Offices" purported to be at 7100 South Bryant Avenue; Oklahoma City, OK.  There are no offices, of course, for Georgetown Corp. at that address.  In fact, there is nothing at that address.  The phone number purportedly listed for the company was an answering machine.

163.    Georgetown Corporation's common stock was deleted from the Over The Counter Bulletin Board (OTCBB) on February 6, 2013.

164.     It is fairly apparent why the RICO Defendants refused to disclose any due diligence on the acquiring corporation – it did not exist.  Instead, they waited until it was too late for SPA-SIMRAD to seek alternate funding, and had no choice but to go forward with the sham deal in the hope the representations and promises repeatedly made by the RICO Defendants had even a scintilla of honesty.  They did not, and SPA-SIMRAD was destroyed.

165.     Even after SPA-SIMRAD was destroyed, the RICO Defendants still wanted to go through with the sham deal.  They, of course, had no interest in a healthy company, only a name they could pump on the OTC Message Boards with fake announcements until they dumped the stock.

166.     From the first negotiation from 2011-2012 and concluding over the five months of negotiations from 2013-2014, false promises and misrepresentations were the only things given by the RICO Defendants.  At no time did the RICO Defendants request additional due diligence, or state there was due diligence which was not produced.

167.     The RICO Defendants never stated the diligence from SPA-SIMRAD was lacking documentation until Defendant WAINSTEIN emailed SPA-SIMRAD on June 13, 2014 about "a few questions that were never answered that were asked of the company".  Defendant WAINSTEIN, however, never stated the substance of the mysterious questions he was referring. This arbitrary excuse and further delay came only after SPA-SIMRAD decided to cut ties with the RICO DEFENDANTS and sought payment for the damages that SPA-SIMRAD incurred as a direct result of the RICO Defendants' fraud. Attached as **Exhibit DD** is a true and accurate copy of the June 13, 2014 email chain highlighting the relevant correspondence between Jason Buratti and WAINSTEIN .

168.    Even now, when questioned about what due diligence was missing, the RICO Defendants provided a silly list seeking documents, which were already produced, never requested and irrelevant.  It was just another excuse.

**Fraud**

169.    Defendants made repeated intentional misrepresentations directly, or on their behalf, that the Bridge Loan would be funded.

170.    Defendants made these representations to induce SPA-SIMRAD to enter into the Merger Agreement and give the RICO Defendants the ability to run their scheme, while putting up nothing of value.

171.    All RICO Defendants knew the falsity of these statements at the time they were made.

172.    In fact, in the March 12, 2014 email, Defendant LEINWAND admitted the prior promises regarding funding were false, and there was no money.  This did not stop LEINWAND from promising a mere two days later that the Bridge Loan would be funded on that day.

173.    On well-over ten separate occasions the promises to fund the Bridge Loan on specific times and dates was made by the RICO Defendants by use of a means of wire communication.

174.    SPA-SIMRAD relied on these knowingly false representations and entered into various purchase orders and contracts, including one with SPA-SIMRAD's key vendor.

175.    SPA-SIMRAD also relied on these statements to forgo other investment opportunities that would have saved the company.  In fact, the RICO Defendants specifically instructed SPA-SIMRAD not to seek other investors or investment opportunities.

176.     The RICO Defendants fraudulently promised to fund the Bridge Loan in order to engage in a scheme or schemes of consumer fraud.

177.     The acts and omissions of the RICO Defendants were malicious, fraudulent and oppressive, justifying an award of punitive damages so that the Defendants will no longer engage in such conduct in the future and make an example of these charlatans to other scammers.  Given their long track record of fraud, only a significant award of punitive damages will have any chance to alter the behavior of the RICO Defendants.

**COUNT ONE**

**SUBSTANTIVE VIOLATION OF THE RACKATEER
INFLUENCED CORRUPT ORGANIZATIONS ACT
(18 U.S.C. §§ 1961(5), 1962(a-c), 1964(c))
Against All Defendants**

178.     Plaintiff re-alleges each and every allegation set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

179.     Throughout the Relevant Period, Defendants WAINSTEIN, WELNER, LEINWAND, SEIFERT, SOKOLOFF and MASTIFF constituted an "enterprise" engaged in interstate commerce pursuant to 18 U.S.C. § 1961(4).

180.     Throughout the Relevant Period, the RICO Defendants were associated with or employed by the MASTIFF Enterprise, and committed at least two acts of racketeering activity within the last ten (10) years pursuant to 18 U.S.C. § 1961(d)(pattern of racketeering activity).

181.     The RICO Defendants participated in the conduct of the MASTIFF Enterprise's affairs through a pattern of racketeering and committed numerous RICO predicate acts under 18 U.S.C. § 1343 by falsely representing in numerous emails, sent by a means of wire communication, that it would fund the Bridge Loan.

182.    The RICO Defendants participated in the conduct of the MASTIFF Enterprise's affairs through a pattern of racketeering and committed numerous RICO predicate acts under 18 U.S.C. § 1343 by falsely representing in numerous emails, sent by a means of wire communication, that they would provide funding to SPA-SIMRAD.

183.    The RICO Defendants participated in the conduct of the MASTIFF Enterprise's affairs through a pattern of racketeering and committed numerous RICO predicate acts under 18 U.S.C. § 1343 by falsely representing in numerous telephone conferences, transmitted by a means of wire communication, that they had funded the Bridge Loan, and on other occasions that they were about to fund the Bridge Loan.

184.    The RICO Defendants participated in the conduct of the MASTIFF Enterprise's affairs through a pattern of racketeering and committed numerous RICO predicate acts under 18 U.S.C. § 1343 by falsely representing in numerous telephone conferences, transmitted by a means of wire communication, that they had the resources to fund the Bridge Loan.  The RICO Defendants have already admitted that these were false representations sent by a means of wire communication.

185.    The RICO Defendants participated in the conduct of the MASTIFF Enterprise's affairs through a pattern of racketeering and committed numerous RICO predicate acts under 18 U.S.C. § 1341 by, and through, hard copy documents sent through the U.S. mail containing false statements made in furtherance of the fraud.

186.    The RICO Defendants participated in the conduct of the MASTIFF Enterprise's affairs through a pattern of racketeering and committed numerous RICO predicate acts under 18 U.S.C. § 1343 by, and through, dozens of false statements made in numerous emails and

telephone conferences, sent by a means of wire communication, seeking to induce SPA-SIMRAD to not seek other sources of funding.

187.    The acts of the RICO Defendants described herein also constitute violations of the Martin Act, New York General Business Law article 23-A, sections 352-353, which is a Class E felony not to exceed four years pursuant to N.Y. GBL § 352-c.  The Martin Act violations represent separate and distinct RICO predicates.

188.    The Rico Defendants racketeering activity include their on-going operation of the Mastiff Website, which is replete with fraudulent representations, and those false claims pose a threat of continued criminal activity.

189.    Throughout the Relevant Period, each of the RICO Defendants assisted and supported the MASTIFF Enterprise in transmitting a series of fraudulent representations through the Mastiff Website, and through other means of wire communication, in order to defraud companies and investors, including Plaintiff.  On the dates above, employees and agents of SPA-SIMRAD did view the Mastiff Website, and were induced into believing the credibility of Defendant MASTIFF and its agents and employees.

190.    The MASTIFF Enterprise's racketeering activities, including the ongoing operation of the website containing multiple fraudulent representations, poses a threat of continued criminal activity.

191.    The RICO Defendants' emails contributed to the fraudulent scheme and constitute wire-fraud under this Court's decision in *Loop Production v. Capital Connections LLC*, 797 F.Supp.2d 338 (S.D.N.Y.  2011).

192.     The above establishes a pattern of at least two acts of racketeering activity under 18 U.S.C. § 1961(5) during the Relevant Period and thereby satisfies the "Pattern Element" under 18 U.S.C. § 1961 *et seq.*

193.     The RICO Defendants benefited from the fraudulent acts of the MASTIFF Enterprise, and used the profits of the MASTIFF Enterprise for their own benefit.

194.     The predicate acts described above have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events and thereby satisfies the relationship prong of the Pattern Element under 18 U.S.C. § 1961 *et seq.*

195.     The acts of the RICO Defendants described herein are a closed-end scheme because the above demonstrates a series of related predicates extending from June of 2011 through May of 2014.  This satisfies the "Continuity Element" of 18 U.S.C. § 1961 *et seq.*

196.     The above acts by the RICO Defendants also constitute an open-ended continuity scheme because they involve acts, which, by their nature, threaten repetition into the future.  In fact, repetition of the acts described herein is a forgone conclusion as the RICO Defendants have repeatedly conducted or participated in the same or similar fraudulent scams over the past ten (10) years.  This additionally satisfies the "Continuity Element" of 18 U.S.C. § 1961 *et seq.*

197.     Within the last ten (10) years, as described herein, the RICO Defendants' schemes to defraud have been advanced, concealed or furthered by the use of the U.S. mail and wires in violation of 18 U.S.C. §§ 1341, 1343 and the collection of unlawful debts in violation of 18 U.S.C. § 1964(c).  Each fraudulent press release, email, website transmission, and phone conference identified above, are separate RICO predicate acts, all of which took place over the last ten (10) years.

198.    The RICO Defendants directly or indirectly, obtained an interest in or control of the MASTIFF Enterprise which was engaged in, or the activities of which affect, interstate or foreign commerce in violation of 18 U.S.C. § 1964(b).

199.    The multiple predicate acts of the RICO Defendants described in the present matter are within a single scheme and encompassed within the RICO statute because the relationship and continuity elements are met.

200.    The scheme to defraud also involved misrepresentations as to past or presently existing facts.

201.    Plaintiff further alleges that all RICO Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. § 1962(b).

202.    SPA-SIMRAD's business and property injuries were directly and proximately the result of the above predicate acts.

203.    SPA-SIMRAD's business and property will face additional injuries in the future as a direct and proximate result of the above predicate acts.

**WHEREFORE**, SPA-SIMRAD prays this Court award it damages including, but not limited to, actual damages, consequential damages, treble damages, pre and post-judgment interest, the reasonable costs and attorneys' fees incurred in bringing this action, and grant such other and further relief as may be just and appropriate.

**COUNT TWO**

**CONSPIRACY TO VIOLATE THE
RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT
(18 U.S.C. §§ 1961(5), 1962(d), 1964(c))
Against All Defendants**

204.    Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

205.    Throughout the relevant period, each of the RICO Defendants were associated with or employed by MASTIFF Enterprise.

206.    Throughout the Relevant Period, each of the RICO Defendants knowingly conspired to further the goals of the MASTIFF Enterprise.

207.    Throughout the Relevant Period, each of the RICO Defendants intended to assist and support the MASTIFF Enterprise in transmitting a series of fraudulent representations through emails, website transmissions, letters and telephone conversations, sent by a means of wire communication, in order to defraud companies and investors, including Plaintiff.

208.    Throughout the Relevant Period, each of the RICO Defendants intended to assist and support the MASTIFF Enterprise in transmitting a series of fraudulent representations through the Mastiff Website, and through other means of wire communication, in order to defraud companies and investors, including Plaintiff.

209.    The MASTIFF Enterprise's racketeering activities, as effectuated by the RICO Defendants, including the ongoing operation of the website containing multiple fraudulent representations, poses a threat of continued criminal activity.

210.    SPA-SIMRAD's business and property injuries were directly and proximately the result of the above predicate acts.

211.    SPA-SIMRAD's business and property will face additional injuries in the future as a direct and proximate result of the above predicate acts.

**WHEREFORE**, SPA-SIMRAD prays this Court award it damages including, but not limited to, actual damages, consequential damages, treble damages, pre and post-judgment interest, the reasonable costs and attorneys' fees incurred in bringing this action, and grant such other and further relief as may be just and appropriate.

### COUNT THREE

**VIOLATIONS OF THE ANTIFRAUD PROVISIONS**
**OF THE FEDERAL SECURITIES LAW**
**Section 17(a) of the Securities Act (15 U.S. Code § 77q(a))**
**and Section 10(b) and Rule 10b-5 thereunder of the Exchange Act**
**Against All Defendants**

212.    Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

213.    All RICO Defendants, both directly and indirectly, were engaged in the fraudulent offer of a security, namely; the Agreement and Plan for Merger and Reorganization, listing on the OTC Market, and Promissory Note under *SEC v. Zanford*, 535 U.S. 813 (2002).

214.    Each and every RICO Defendant made material misrepresentations in further of the fraud through the use of a means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly.

215.    As described herein, the RICO Defendants employed several devices, schemes, or artifices to defraud, in order to obtain money or property from Plaintiff by means of innumerable untrue statement of a material facts and omissions of materials fact.  The RICO Defendants calculatedly made the material misrepresentations with the intent to defraud the Plaintiff.

216.    Defendants provided dates and times for funding of the Bride Loan, knowing there was no capital to fund the loan.  Defendant LEINWAND even admitted to the material misrepresentations, and disclosed there was no money.  Two days after this admission, Defendant LEINWAND was right back to providing dates and time for funding, knowing there was no capital.

217.    The RICO Defendants omitted all information regarding the bogus shell corporation that was to acquire Plaintiff.  The RICO Defendants did so knowing the disclosure of the requested financials would have resulted in an immediate termination of the Merger by SPA-SIMRAD.

218.    The RICO Defendants deliberately withheld the due diligence, despite numerous requests, in an attempt to induce Plaintiff to forgo seeking alternative avenues for funding.  The RICO Defendants intended to delay this process until Plaintiff had no choice but to go forward.

219.    These material misrepresentations and omissions made by the RICO Defendants were made in connection with the offer, sale or purchase a securities, were relied on Plaintiff.

220.    Had Plaintiff know the truth of any of the facts underlying each of the material misrepresentation; namely, that (i) Defendants had no capital or access to capital, (ii) Georgetown Corp. was a fictitious shell with no capital, (iii) the Bridge Loan would never be funded, (iv) Defendants were in the business of pump-and-dump fraud, among others – Plaintiff would have immediately rejected the agreements and sought alternate sources of funding.

221.    Plaintiff would have been able to fund alternate funding prior to the critical date, and would be thriving in business today.

222.    The RICO Defendants were engaged in transactions and course of business, which operated a fraud or deceit upon the SPA-SIMRAD.

223.     There is a clear jurisdictional nexus to interstate commerce.

**WHEREFORE**, SPA-SIMRAD prays this Court award it damages including, but not limited to, actual damages, consequential damages, exemplary damages, pre and post-judgment interest, the reasonable costs incurred in bringing this action, and grant such other and further relief as may be just and appropriate.

**COUNT FOUR**

**COMMON-LAW FRAUD**
**Against All Defendant**

224.     Plaintiff re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

225.     As described above, each of the RICO Defendants made material misrepresentations, Plaintiff relied on those material misrepresentations and was induced into forgoing other financing opportunities that would have saved the company.

226.     Plaintiff relied on the material misrepresentations and entered into agreements and/or contracts with fictitious companies on the representation Georgetown Corp. was an actual corporation with assets sufficient to fund the Bridge Loan and the capital investment under the Merger Agreement.

227.     RICO Defendants knew the falsity of these statements at the time they were made.

228.     RICO Defendants intended on Plaintiff to rely on their known false representations.

229.     These acts were malicious, fraudulent and oppressive, justifying an award of punitive damages so that the RICO Defendants will no longer engage in such conduct in the future and make an example of them.

230.    SPA-SIMRAD's business and property has been damaged by reason of Defendants' multiple fraudulent representations in connection with the operation of the MASTIFF Enterprise.

**WHEREFORE**, SPA-SIMRAD prays this Court award it damages including, but not limited to, actual damages, consequential damages, punitive damages, pre and post-judgment interest, the costs incurred in bringing this action, and grant such other and further relief as may be just and appropriate.

## COUNT FIVE

**DECEPTIVE AND UNFAIR BUSINESS PRACTICES**
**GENERAL BUSINESS LAW § 349**
**Against All Defendant**

231.    Plaintiff re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

232.    As described above, each of the RICO Defendants were engaged in consumer-oriented conduct that was materially misleading.

233.    The RICO Defendants' misleading and deceptive acts were intended to have a broader impact on consumers at large, namely the thousands of consumers whom the RICO Defendants intended to defraud into purchasing inflated shares of a company the RICO Defendants intentionally destroyed.

234.    The RICO Defendants intended, as they have done in dozens of other matters, to sell their shares of the over-valued company so they could dump their shares, leaving the consuming public holding worthless stock.

235.    Plaintiff suffered injuries as a direct result of the deceptive acts and practices of the RICO Defendants.

**WHEREFORE**, SPA-SIMRAD prays this Court award it damages including, but not limited to, actual damages, consequential damages, punitive damages, pre and post-judgment interest, the reasonable costs incurred in bringing this action, and grant such other and further relief as may be just and appropriate.

## COUNT SIX

### DECEPTIVE AND UNFAIR BUSINESS PRACTICES
### GENERAL BUSINESS LAW § 350
**Against All Defendant**

236.    Plaintiff re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

237.    As described above, the RICO Defendants were engaged in consumer-oriented conduct that was materially misleading.

238.    The RICO Defendants' misleading and deceptive acts were intended to have a broader impact on consumers at large, namely the thousands of consumers whom the RICO Defendants intended to defraud into purchasing inflated shares of a company the RICO Defendants intentionally destroyed.

239.    The RICO Defendants intended, as they have done in dozens of other matters, to sell their shares of the over-valued company so they could dump their shares, leaving the consuming public holding worthless stock.

240.    To accomplish this, the RICO Defendants falsely advertised through their website that they are credible businesspersons, engaged in the business of aiding companies for the benefit of the company and of the consuming public.

241.    Plaintiff relied on these false statements, which was the RICO Defendants intention, and suffered injuries as a direct result of the allegedly deceptive act or practices of the RICO Defendants.

**WHEREFORE**, SPA-SIMRAD prays this Court award it damages including, but not limited to, actual damages, consequential damages, punitive damages, pre and post-judgment interest, the reasonable costs incurred in bringing this action, and grant such other and further relief as may be just and appropriate.

## RELIEF REQUESTED

Wherefore, pursuant to 18 U.S.C. § 1964(a) and (c), Plaintiff requests judgment against all named Defendants as follows:

1.    **FINDING OF VIOLATION**: That this Court liberally construe the RICO statute and thereby find that all Defendants, jointly and severally, have violated the Racketeer Influenced Corrupt Organizations Act 18 U.S.C. §§ 1962(c), 1964(c), both directly and indirectly, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C. § 1962(b) (Prohibited activities).

2.    **DEFENDANTS BE ENJOINED FROM FURTHER PARTICIPATION**: That all Defendants as well as all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from further participation in the MASTIFF GROUP, whether directly or indirectly.

3.  **DEFENDANTS BE ENJOINED FROM FURTHER PREDICATE ACTS**: That all Defendants as well as all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT ONE.

4.  **ACCOUNTING**: That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering activity in violation of 18 U.S.C. § 1962(b) and from all other violation(s) of applicable State and federal law(s).

5.  **DAMAGES**: That judgment be entered for Plaintiff and against all Defendants, jointly and severally, for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. § 1962(b), according to the best available proof.

6.  **TREBLE DAMAGES**: That all Defendants, jointly and severally, pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. § 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. § 1962(b), according to the best available proof.

7.  **CONSEQUENTIAL DAMAGES**: That all Defendants, jointly and severally, pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. § 1962(b), according to the best available proof.

8.      **ATTORNEYS' FEES AND COSTS**: That all Defendants, jointly and severally, pay to Plaintiff its costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsels' fees.

9.      **TRUST**: That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. § 1962(b) and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, for the benefit of Plaintiff, its officers and assignees.

10.     **PUNITIVE DAMAGES**: That Plaintiff be awarded punitive damages on Counts against all Defendants in an amount that is likely to stop the Defendants from continuing their careers of fraud, and to discourage other individuals from such activity.

11.     **PRE AND POST-JUDGEMENT INTEREST**: That all Defendants, jointly and severally, pay to Plaintiff interest on all damages sustained by the Defendants' acts prior to judgment and until such time as any judgment rendered by this Court is satisfied.

12.     **OTHER JUST RELIEF**: That Plaintiff have such other and further relief as this Court deems just and proper, under the circumstances of this action.

### DEMAND FOR TRIAL BY JURY

13.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by the complaint.

Dated: September 7, 2014

Respectfully submitted,

**GARBARINI FITZGERALD P.C.**

By: *Richard M. Garbarini*

Richard M. Garbarini (RG 5496)
rgarbarini@garbarinilaw.com
420 Lexington Avenue
Suite 2743
New York, New York 10170
Telephone: (212) 300-5358
Facsimile: (888) 265-7054

*Attorneys for Plaintiff*

**LIST OF EXHIBITS**

Pursuant to 18 U.S.C. § 1961(9), Plaintiff now formally incorporates its documentary

material by reference to all of the following Exhibits, as if set forth fully here, to wit:

Exhibit "A" with Cover Sheets

Exhibit "B" with Cover Sheets

Exhibit "C" with Cover Sheets

Exhibit "D" with Cover Sheets

Exhibit "E" with Cover Sheets

Exhibit "F" with Cover Sheets

Exhibit "G" with Cover Sheets

Exhibit "H" with Cover Sheets

Exhibit "I" with Cover Sheets

Exhibit "J" with Cover Sheets

Exhibit "K" with Cover Sheets

Exhibit "L" with Cover Sheets

Exhibit "M" with Cover Sheets

Exhibit "N" with Cover Sheets

Exhibit "O" with Cover Sheets

Exhibit "P" with Cover Sheets

Exhibit "Q" with Cover Sheets

Exhibit "R" with Cover Sheets

Exhibit "S" with Cover Sheets

Exhibit "T" with Cover Sheets

Exhibit "U" with Cover Sheets

Exhibit "V" with Cover Sheets

Exhibit "W" with Cover Sheets

Exhibit "X" with Cover Sheets

Exhibit "Y" with Cover Sheets

Exhibit "Z" with Cover Sheets

Exhibit "AA" with Cover Sheets

Exhibit "BB" with Cover Sheets

Exhibit "CC" with Cover Sheets

Exhibit "DD" with Cover Sheets

Exhibit "EE" with Cover Sheets

Exhibit "FF" with Cover Sheets

Exhibit "GG" with Cover Sheets